**Marie M. MORAN**

v.

**Francis T. MORAN, Jr.**

**No. 91–245–Appeal.**

Supreme Court of Rhode Island.

July 3, 1992.

---

Alfred Factor, Paul J. Russo, Christopher Russo, Kirshenbaum & Kirshenbaum, Cranston, for plaintiff.

Joseph E. Marran, Jr., Pawtucket, for defendant.

## OPINION

MURRAY, Justice.

This is an appeal from a divorce decree entered in the Family Court in which the trial justice granted the wife's petition and the husband's cross-petition for an absolute divorce based upon irreconcilable differences that had caused the breakdown of the marriage. The husband appeals from the court's assignment of property and the award of alimony and counsel fees to the wife. In addition the husband takes issue with several discretionary and evidentiary rulings by the trial justice. We affirm.

Marie M. and Francis T. Moran were married in Rhode Island on August 13, 1960. There were five children born during the marriage, all of which were emancipated at the time of the trial.

Francis was employed by the city of Pawtucket throughout the course of the marriage, initially as a teacher and ultimately as principal of Tollman High School. Francis also operated a newspaper business from the beginning of the marriage until 1971. In addition he engaged in various outside activities, including coaching and officiating sporting events, antipoverty work and youth counseling. Marie worked as a homemaker, with the exception of periods in which her mental illness prevented her from performing her homemaking duties. In that instance either Francis or the children would perform the duties, or on some occasions Francis would hire outside help to assist in the work.

There was extensive testimony presented at trial concerning Marie's mental health. Marie bore her first child just nine months after she was married. When her first child was only five months old, Marie again became pregnant. Subsequent to the birth of her second child, Marie was hospitalized in 1962 for approximately three months,

and later readmitted for another three months due to mental illness. Marie was diagnosed as having depression with psychosis. Marie gave birth to a third child in 1964. In 1965 Marie was again hospitalized for four weeks with a diagnosis of psychiatric depression. Later in 1965 Marie gave birth to her fourth child and bore her last child in 1967. In 1971 Marie experienced a mental breakdown and was hospitalized for approximately four weeks. During that hospitalization, Marie was diagnosed as psychotic. In 1973 Marie was hospitalized for six weeks due to her catatonic psychotic state. Marie treated with several psychiatrists throughout the marriage and up to and throughout the course of the trial. She was at all times during the marriage taking various medications for her mental illness. It was revealed through testimony that on three occasions, Marie had attempted to commit suicide.

There was also a great deal of testimony presented at the trial concerning Francis's physical and verbal abuse of Marie, as well as the five children, and his excessive drinking habits throughout the marriage. Marie testified that the first incident of physical abuse occurred just one month after their marriage when Francis slapped her across the face. On another occasion Francis slapped Marie across the face three or four times while she was pregnant. On their fourteenth wedding anniversary Francis slapped her approximately seven times. He also pulled her hair and dragged her up a flight of stairs by her hair. Marie recalled that in 1979 Francis slapped her across the face and hit her on the ear, breaking her eardrum. On Father's Day in 1988, Marie testified that Francis hit her twice across the face and then tried to strangle her. Marie stated that on another occasion Francis was choking her on their bed. When one of their sons heard her screaming for help he came to her rescue. The son struck Francis with a baseball bat. Marie also testified that Francis abused the five children throughout the marriage. She stated that violence was visited upon her by her husband about every three months during the course of the marriage. However, Marie testified that the verbal abuse was present at all times during the marriage. Marie stated that Francis would constantly use vulgarities, calling her names and telling her that she was lazy.

There was also testimony presented concerning Francis's drinking habits. Marie testified that Francis initially drank beer, but that in 1976 he started to drink wine. Marie testified that for a period of five or six years Francis drank a half gallon of wine a day. This wine consumption increased to a whole gallon on Saturdays and Sundays and one-half gallon on Thursdays and Fridays. Marie stated that Francis's drinking precipitated his abuse to her and the children.

Four of the five Moran children testified at trial, at which time their ages ranged from twenty-three to twenty-nine. All of the children were excellent students and have successfully pursued various careers; they are a lawyer, a clinical psychologist, a medical doctor, an electrical engineer and a government employee. Rather than repeat each of the children's extensive testimony, we shall briefly sum up their statements. All four children testified that as far back as they could remember, their father verbally and physically abused their mother. They also recalled their father drinking heavily on a regular basis throughout the marriage, first beer and then wine. The children recalled that several times they observed bruises, black eyes and red marks on their mother as a result of their father's abuse. If one of the children attempted to prevent Francis from abusing Marie, they would then be abused along with their mother. Their collective testimony corroborated in every instance that of Marie's testimony.

The children also testified to the violence done to them by their father. Francis would line the children up and strike them with a belt. During more explosive outbursts Francis would repeatedly slap the children and punch the boys, sometimes drawing blood. In addition Francis would assign tasks to the children which were impossible to perform and then abuse them when the task was not completed. Two of the boys recalled being hit with a belt ten

to fifteen times each on one occasion. One child related an incident at the dinner table when Francis became angry because the salt and pepper were not on the table. With all the children in attendance, Francis threw a dish of potatoes at Marie, hitting her in the face. Again all four children testified about their father's excessive consumption of alcohol. One child recalled his father drinking two cases of beer a week and later when he switched to wine, drinking a gallon of wine per day on the weekend.

The children testified that Marie was the primary homemaker. One of the children testified that she would wash their clothes, clean the house and cook the meals. Marie was responsible for getting the children ready for school and sending them off to school on time.

Francis testified at trial. He admitted that in 1973 he started to drink heavily and that he drank wine every day. He stated that the heavy drinking lasted until 1976, but admitted that it resumed again later that year. Francis testified that the physical abuse of his wife started in 1970. He claimed that he would become angry and slap his wife, but that after each incident he would apologize. Francis also admitted using abusive language toward his wife. Francis admitted the incident which occurred on Father's Day in 1988 when he grabbed Marie by the neck in a rage. Francis claimed that he acted out of blind anger because Marie had stated that she wanted a divorce. However, Francis denied the claim by Marie that he tried to choke her in their bed. His version of that incident was that Marie was in her son's bedroom and Francis wanted her in their bedroom with him. He claimed that suddenly and without any warning Marie began screaming for help and that their son rushed into the bedroom swinging a baseball bat. However, the son's testimony corroborated Marie's testimony with respect to that incident.

Francis seemed to blame his wife's mood swings and irrational behavior for his violence. He testified that the house was oftentimes in disarray because she was in-capable of performing her homemaking duties and that this made him extremely frustrated. He stated that many times he would not have clean clothes to wear to work. When Marie was ill it was impossible for her to take care of the children and this would make Francis very angry.

Francis also testified about his relationship with his children. He described himself as a strict disciplinarian and admitted to striking the children with a belt. Francis viewed the punishment merely as discipline, and denied using excessive force. Francis stated that he would hit the children, but never more than three times.

The trial justice heard extensive testimony from several expert witnesses concerning Marie's mental condition throughout the course of the marriage, as well as her condition at the time of the trial. Doctor William Braden, a psychiatrist practicing in Rhode Island, testified on behalf of Marie. Doctor Braden began treating Marie in September of 1989. He stated that the history that he had received concerning Marie's illness demonstrated to him that Marie had manic-depressive illness. Doctor Braden continued to see Marie on a monthly basis up to the time and throughout the course of the trial. The doctor stated that when he first met her, Marie was in a "psychotic" state and she had a chronic illness. Marie was complaining of depression and dizziness. In Dr. Braden's opinion, Marie is unable to maintain a job. He opined that she could not consistently report to work due to her drastic mood swings. Doctor Braden indicated that Marie has been on several medications which partially control her mood swings, but that her mood still changes dramatically. Doctor Braden admitted that in the future Marie's condition could improve, but that it was highly unlikely because although she has been under doctors care and on medication since 1973 her condition has not improved.

On cross-examination Dr. Braden stated that in his opinion Marie was not psychotic at the time of the trial. However, he stated that she suffers from a chronic mental

illness, that was, on at least one occasion, severe enough to render her psychotic.

Doctor Thomas J. Paolino testified as an expert witness at trial concerning Marie's mental illness. Doctor Paolino stated that he was asked by Francis's attorney to perform a psychiatric examination on Marie prior to the trial and to make a determination whether she was psychiatrically disabled with respect to employment. The attorney told Dr. Paolino that the examination was being scheduled at the request of the trial justice. Doctor Paolino met first with Francis and then with Marie on April 13, 1990.

Doctor Paolino conducted an extensive interview with Marie, as well as with her three sons, and reviewed her past medical records which he obtained from the various hospitals into which she had been admitted. Doctor Paolino concluded that Marie suffered from "looseness of association" which causes her thoughts to be disorganized and not logically connected. Doctor Paolino diagnosed Marie as suffering from bipolar depression, which consists of a series of high and low mood swings. He stated that at the time of the interview she was in depression, but had a history of being manic, a state of high anxiety. Doctor Paolino also diagnosed Marie as having psychotic features, but stated that at that time she was not psychotic. Doctor Paolino testified that in his determination Marie was psychiatrically disabled with respect to employment. However, he deemed her competent to handle her own affairs and to take part in the trial.

On cross-examination Dr. Paolino admitted that it could be possible that at some point in the future Marie might be capable of working. However, he stated that in his opinion it was not probable. He based his opinion on her thirty-year history of depression and her multiple hospitalizations. In response to questions regarding the affect that Marie's illness might have on a spouse, Dr. Paolino stated that a spouse of a manic-depressive would be subjected to a great deal of stress. More specifically, Dr. Paolino opined that under the circumstances Francis did a good job holding down a job, raising five children and worrying about his sick wife.

The last expert witness to testify at trial was Dr. Nicholas Nunez, who is a psychiatrist licensed to practice in Rhode Island. Doctor Nunez first became acquainted with Marie in September of 1979. He treated her from that date until 1989, when she began treatment with Dr. Braden. Doctor Nunez characterized Marie as bipolar, a condition which causes one to experience dramatic mood swings. The doctor testified about the treatment over the ten year period stating that the severity of Marie's illness had fluctuated and that he had adjusted her medication accordingly.

Doctor Nunez testified about many of the concerns expressed to him by Marie throughout the course of the treatment. Although there were periods of remission, Marie would frequently fall into a state of depression. She would state that she felt extremely negative, felt ill and feared death. Marie expressed displeasure with her husband's drinking. She thought he was an alcoholic, and she was suspicious of him. Marie felt fearful of her husband. She spoke of matches and poison in the house. Doctor Nunez opined that during these times of depression Marie's thoughts were not well organized. In 1982 Marie told Dr. Nunez that she blamed her husband for family disruption. Marie also complained consistently about verbal abuse from her husband.

In response to a question by Francis's counsel concerning Marie's ability to maintain her sanity, Dr. Nunez responded that that is something he cannot predict. Doctor Nunez testified that when Marie goes through fluctuating moods there is no way she would be capable of functioning in an employment situation. The doctor stated that he did not know if Marie could work if employment became available to her.

The trial concluded on May 11, 1990, and the trial justice rendered a written decision on January 4, 1991. With respect to the financial status of the parties, the trial justice in his decision found that the parties have the following assets: a marital domicile in Pawtucket, Rhode Island, worth

$134,000; a pension plan worth $467,000; two IRA's, one worth $10,939 and the other worth $8,600; two annuities, one valued at $36,398 and the other valued at $14,584; an insurance policy worth $11,400; and a Cadillac worth $4,500. The trial justice declined to make a determination of the value of the jewelry or household furniture and effects because no accurate appraisals were offered on these items.

The trial justice first considered the assignment of the marital property. In so doing, the court properly considered the length of the marriage, the conduct of the parties, the contribution of each to the acquisition of the property, and the contribution of each to the acquisition, preservation, or appreciation and value of their respective estates. The trial justice also considered the contribution and services of each party as a homemaker.

The trial justice, after reviewing all the testimony and exhibits, found by clear and convincing evidence that the fault for the break up of this marriage lies with defendant, Francis. The court found that although defendant was a hard-working individual, performed many homemaking chores, and was admired as an educator, he was physically and mentally abusive to his wife and children. The court found that for many years during the marriage defendant had a serious drinking problem. The trial justice also found that defendant did not allow plaintiff freedom to develop as an individual.

The trial justice found, with respect to Marie, that she was a good wife and mother as shown by the affection expressed toward her by her children during the trial. He found that when Marie was not hospitalized, she adequately performed all the duties of mother and homemaker. He found that Marie was never abusive towards her husband or her children, and at all times acted as a good and faithful wife throughout the marriage, despite the fact that she suffered from a mental disorder which seriously affected her health.

Based on these findings, the trial justice awarded to Marie the marital domicile. He awarded to Francis the two IRA's, the two annuities, the insurance policy and the Cadillac.

Next, the trial justice considered Francis's pension plan. The court awarded to Marie a one-half interest in Francis's pension plan by providing for a qualified domestic-relations order dividing Francis's municipal-employee pension plan. The trial justice accepted the opinion of expert witness, Robert H. Goff, Jr., with respect to the net value of the pension plan, which Goff determined to be $467,786.

The trial justice recognized and discussed at length the provision in G.L.1956 (1990 Reenactment) § 36–10–34 which exempts a municipal employee's pension from lien, attachment or garnishment, and provides that such pension is not transferable or assignable. The trial justice justified his decision to award a portion of the pension to Marie by relying on Pennsylvania case law.

The trial justice then considered an award of alimony. The trial justice appropriately considered the length of the marriage, the conduct of the parties, and their health, age and occupation. He unequivocally found that Marie was in need of permanent alimony. The trial justice found that there was a thirty-year marriage, that the couple lived a middle-income lifestyle, and that fault lies with Francis. The court also found that based on all record testimony that Marie is permanently disabled, that she has no vocational skills and that she is not employable.

Relying on exhibits and financial statements presented at trial, the court found that Francis has a biweekly gross income of $2,690 but a net income of only $1,080. However, he has a savings-plan reduction of $350 and mortgage and property-tax deductions of $413. Thus the trial justice found his weekly income to be $1850. According to the financial statements, Francis's weekly expenses amount to $643. However, the court found that because Francis no longer is responsible for the marital domicile and that he listed some expenses which the court deemed unreasonable, Francis is capable of paying to Marie weekly alimony in the amount of

$450. The court characterized this amount to be $50 below Marie's needs, as evidenced by her financial statements. The court ordered that alimony be paid to Marie for the remainder of her life. However that rate shall be reduced by any social security or disability benefits she may receive, which benefits the court ordered her to seek. Upon receiving payments from Francis's pension plan, however, Marie's alimony shall be reduced accordingly. But the court stated that if the pension benefit is in excess of the alimony award, Marie is to receive her full share of the pension benefit.

Finally, the trial justice considered the requests by each party for an award of attorney's fees. The court found that Francis had adequate funds from which to pay his attorney and did not, therefore, award him attorney's fees. However, the trial justice concluded that Marie did not possess adequate funds from which to pay her attorney. The court ordered Francis to pay Marie's attorney as a contribution towards his fee the sum of $7,500. The parties were also awarded exclusive use and title to all assets each had in his or her possession. In addition Francis was ordered by the court to provide health-insurance coverage for Marie.

■ On appeal Francis raises several issues for our consideration. First, he argues that the trial justice erred in awarding to Marie a one-half interest in his municipal pension by providing for a qualified domestic-relations order dividing the pension. Francis asserts that § 36–10–34 precludes his pension from division upon dissolution of the marriage. Section 36–10–34 provides in pertinent part:

"Any and all retirement benefits and contributions in the state employees' and municipal employees' retirement systems shall be exempt from lien, attachment, or garnishment and shall not be transferrable or assignable."

Furthermore, Francis contends that in *Stevenson v. Stevenson*, 511 A.2d 961 (R.I. 1986), this court held that a municipal police officer's pension was not subject to division upon dissolution of marriage pursuant to G.L.1956 (1985 Reenactment) § 9–26–5, which exempts police and firemen's pensions from attachment or assignment.[1] However, defendant has clearly misunderstood our decision in that case.

In *Stevenson* the trial justice for the purposes of equitable distribution took into consideration as a marital asset the defendant husband's municipal pension plan. The trial justice did not grant the wife any interest in the pension, he merely "placed the pension on the scale along with the other marital assets when he weighed and divided" those assets. 511 A.2d at 965. As we stated in that case, the trial justice's decision did "not in any sense constitute an assignment within the meaning of [the statute]." *Id.* Because the trial justice did not assign any interest in the pension, we specifically declined to address the issue of whether an exemption statute precludes division of a pension upon dissolution of the marriage. However since the case at bar squarely presents this issue for our consideration, we shall now make that determination.

Although in *Stevenson* we did not decide whether a municipal pension is subject to equitable distribution, we recognized that there exists some precedent in Rhode Island, as well as in other jurisdictions for viewing pensions in general as marital property subject to equitable distribution. *Stevenson*, 511 A.2d at 964 (citing *Casey v. Casey*, 494 A.2d 80 (R.I.1985), and *Whited v. Whited*, 478 A.2d 567 (R.I.1984)). We noted that there was nearly unanimous

---

1. General Laws 1956 (1985 Reenactment) § 9–26–5 states:

"Exemption of police and firemen's pensions—Assignments invalid.—No interest of any person in any pension fund or in any pension derivable therefrom, for the benefit of policemen or firemen, now or hereafter created or held by authority of law by any city or town, or by any public officer or officers or board of officers therein, to which fund such city or town contributes in any way, shall be subject to trustee process or liable to attachment on any writ, original, mesne, or judicial, or be taken on execution or any process, legal or equitable; and no assignment of any such interest shall be valid."

support for that proposition. *Id.* One predominant rationale behind this weight of authority was aptly stated in one treatise as follows:

"To the extent earned during the marriage, the benefits represent compensation for marital effort and are substitutes for current earnings which would have increased the marital standard of living or would have been converted into other assets divisible at dissolution. Subjecting the benefits to division is just, because in most cases the retirement benefits constitute the most valuable asset the couple has acquired and they both have relied upon their pension payments for security in their older years." 3 Rutkin, *Family Law and Practice* § 37.-07[1] at 37–81 (1985).

A pension has been viewed by this court as a form of "forced savings account whose funds will become available to the parties upon retirement." *Stevenson,* 511 A.2d at 965.

The trial justice in making his decision on the distribution of the pension relied on Pennsylvania case law. In *Young v. Young,* 507 Pa. 40, 488 A.2d 264 (1985), the Pennsylvania Supreme Court was faced with the issue of whether a municipal pension was subject to attachment in order to satisfy a spousal support order. In effect at the time was an act which exempted the subject pension from attachment or execution. The *Young* court considered the intent of the Legislature in creating the pension statute and the rationale behind strict enforcement of support orders. The court first noted that pension systems were created for the benefit of the retirees and their families. Next the court noted that the purpose of the exemption statute is to "protect pension funds from the claims of creditors, for the benefit of [the retirees] and their families." *Id.* at 47, 488 A.2d at 267. The court went on to examine the rationale behind and the priority given to the enforcement of support orders.

The *Young* court concluded that the exemption statute was not intended to deprive a family of pension benefits or to allow a retiree to evade his familial support obligations. In so doing, the court stated:

"[W]e note that a family loses its ability to spend a portion of its income when that income is deferred and placed in a pension. It would be terribly unfair to read an exemption statute, which was created to protect a pension for the benefit of a retired employee's family, in such a way that the exemption would bar children or a former spouse from receiving support from the very fund created for their benefit, and would once again deny them the benefits of the income they sacrificed to a pension years before." 507 Pa. at 50, 488 A.2d at 269.

We adopt the rationale set forth in *Young,* and incorporate the rationale behind the view that pensions in general are subject to equitable distribution, and thus conclude that Francis's municipal pension is not exempt from equitable distribution upon dissolution by virtue of § 36–10–34. We believe this to be the more just conclusion, as the converse would lead to absurd and unfair results. We do not believe that the Legislature intended this exemption statute to create such inequities within the family unit.

■ Francis also alleges that the trial justice committed error in awarding to Marie permanent alimony and counsel fees. Francis contends that the evidence presented at trial does not support the trial justice's findings that Marie was not employable and that she was incapable of paying her attorney's fees.

■ Awards of alimony and counsel fees require the trial justice to evaluate the evidence in view of the factors set forth in G.L.1956 (1988 Reenactment) § 15–5–16. Those factors are "[1] the length of the marriage; [2] the conduct of the parties during the marriage; [3] the health, age, station, occupation, amount and source of income, vocational skills and employability of the parties; and [4] the state and the liabilities and needs of each of the parties." Section 15–5–16. In reviewing the findings of a trial court, "it is not our function to

arrive at de novo findings and conclusions of fact based on the evidence presented at trial." *Casey v. Casey,* 494 A.2d 80, 82 (R.I.1985). Unless we are convinced that the trial justice misconceived relevant evidence or was otherwise clearly wrong, findings by the trial justice will not be disturbed. *Id.*

Although we have held that the purpose of alimony is rehabilitative in nature and that it should be payable for a short and definite period, *Stevenson,* 511 A.2d at 967; *Casey,* 494 A.2d at 83; *D'Agostino v. D'Agostino,* 463 A.2d 200, 202 (R.I.1983), we have also stated that some factual circumstances warrant an award of permanent alimony. *Perreault v. Perreault,* 540 A.2d 27, 30 (R.I.1988). "Nothing contained in the statute or our prior holdings is to be construed as precluding an award of open-ended alimony in a proper situation." *Id.* at 30.

It is our opinion that in the instant case the evidence presented at trial warrants an open-ended award of alimony. The parties were married for a thirty-year period, none of which the wife was employed. The wife suffers from mental illness, lacks vocational skills and thus lacks the ability to generate an income. Moreover, with respect to the conduct of the parties, the trial justice justifiably found fault on the part of the husband. The husband physically and verbally abused his wife and children throughout the course of the marriage and engaged in excessive drinking. We believe that the trial justice properly considered the evidence in light of the factors set forth in § 15–5–16 and appropriately awarded to the wife open-ended alimony.

■ Similarly we believe that the trial justice properly awarded to Marie attorney's fees. As previously stated, the trial justice applies the same criteria as those set forth in § 15–5–16 to make an award of attorney's fees. The trial justice must find that the husband has sufficient funds with which to pay such fees and that the wife has insufficient funds for that purpose be-

fore he is warranted in making an award of counsel fees. *Perreault,* 540 A.2d at 31 (citing *Tarro v. Tarro,* 485 A.2d 558, 564 (R.I.1984)). Our review of the record reveals that the trial justice clearly made these findings and that there is nothing to indicate that he abused his discretion or that his decision was clearly wrong. Accordingly, the award of counsel fees will not be disturbed.

■ In addition to alleging error with respect to the trial justice's decision to make an award of permanent alimony, Francis also takes issue with the amount of alimony awarded. After carefully reviewing the financial statements and the testimony presented to the trial justice, we find the award to be well within the discretion of the trial justice. Marie had listed on her financial statement $700 for rent. Francis argues that because she has been awarded the marital domicile that figure is no longer justified. We disagree. The marital domicile was awarded to Marie subject to a mortgage. Marie is now responsible for the mortgage, taxes, maintenance, and all other costs involved with maintaining property. Thus it is our opinion that the trial justice acted appropriately in making this award. Also we note that both parties are free to petition the Family Court for an adjustment in alimony pursuant to § 15–5–16 in the event that there occurs a substantial change in circumstances.

We have carefully reviewed Francis's other assignments of error and find them to be without merit.

Accordingly the husband's appeal is denied and dismissed. The decree of the Family Court is affirmed. The papers of the case may be remanded to the Family Court.