845 A.2d 270 (2004)
The RETIREMENT BOARD OF the EMPLOYEES' RETIREMENT SYSTEM OF the STATE of Rhode Island
v.
Edward D. DiPRETE et al.
No. 2000-0429-Appeal.
Supreme Court of Rhode Island.
March 26, 2004.
*276 Thomas A. Palombo, David D. Barricelli, Providence, for Plaintiff.
Robert D. Goldberg, Pawtucket, John D. Lynch, Warwick, for Defendant.
Present: WILLIAMS, C.J., FLAHERTY and SUTTELL, JJ.

OPINION
WILLIAMS, Chief Justice.
Abraham Lincoln once explained that "[t]he legitimate object of government is to do for * * * people whatever they need to have done, but cannot do at all, or cannot so well do, for themselves * * *."[1] Implicit in this is an indispensable ingredient of a well-functioning democracy  the element of trust. Public officials are honored with the opportunity to serve the public to benefit the people. It is expected that those officials will fulfill their commitments with loyalty, honor and integrity. This opinion comes in the wake of an elected official's decision to breach that commitment.
"The past is never dead," William Faulkner wrote. In fact "[i]t's not even past."[2] This case represents a sad and hopefully last chapter in Rhode Island's storied political "past." The defendant, former Rhode Island Governor Edward D. Di-Prete (Mr. DiPrete), appeals from a Superior Court judgment revoking his pension and other retirement benefits pursuant to the Public Employee Pension Revocation and Reduction Act (PEPRRA), G.L. 1956 chapter 10.1 of title 36, after he pled guilty to eighteen criminal counts for acts committed while in office between 1985 and 1991. The plaintiff, the Retirement Board of the Employees' Retirement System of the State of Rhode Island (Retirement Board), which initiated this revocation action, cross-appeals from the trial justice's decision to return all of Mr. DiPrete's retirement contributions. Mr. DiPrete's wife, Patricia H. DiPrete (Mrs. DiPrete), also appeals from a judgment prohibiting her from collecting any portion of Mr. DiPrete's pension and other benefits as an *277 innocent spouse pursuant to § 36-10.1-3(d).
Mr. DiPrete presents numerous arguments Why his pension and other benefits should not be revoked. None of his arguments is supported in law or in fact. We hold as follows:
1) Mr. DiPrete was subject to pension revocation under PEPRRA although he committed his many crimes dishonoring his office of Governor before 1996.
2) The resolution of the criminal case against Mr. DiPrete did not preclude the Retirement Board from seeking to revoke Mr. DiPrete's pension and benefits.
3) The failure to join Mrs. DiPrete as an indispensable party did not require dismissal of this revocation action against Mr. DiPrete.
4) The Retirement Board's complaint seeking pension revocation under PEPRRA stated a claim upon which relief can be granted.
5) The General Assembly did not supersede PEPRRA to maintain preferable tax status of the state's retirement system.
6) Based on his dishonorable behavior as governor and the clear purpose of PEPRRA, the trial justice properly revoked Mr. DiPrete's pension and benefits in their entirety.
With respect to Mrs. DiPrete, we believe that the trial justice's decision to deny her request for even a portion of the retirement benefits was based on a misapplication of § 36-10.1-3(d). We hold that the trial justice erred by failing to consider the importance of the economic partnership theory of marriage as it applies to the determination of justice required under the laws of this state, particularly § 36-10.1-3(d). The trial justice's decision also was flawed because he improperly drew an adverse inference against Mrs. DiPrete and he failed to make all required findings of fact. Therefore, we vacate the portion of the judgment pertaining to Mrs. Di-Prete and remand for a further determination of her rights to the revoked pension and benefits in accordance with this opinion.
As a consequence of our decision with respect to Mrs. DiPrete, we also vacate the portion of the judgment ordering the return of contributions to Mr. DiPrete. As we discuss, the General Laws of Rhode Island, specifically § 36-10.1-4(b), expressly require Mr. DiPrete's retirement contributions to be returned to him, without interest. The portion of Mr. DiPrete's return shall depend on the percentage of the benefits that the Superior Court may award Mrs. DiPrete.

I

Facts and Travel
Mr. DiPrete took office as Rhode Island's Governor in January 1985. Twice reelected, Mr. DiPrete served in that important capacity until January 1991, at which time he entered retirement when he was defeated in his bid for reelection. Pursuant to the state's retirement plan, Mr. DiPrete began collecting a pension[3] plus life and health insurance benefits.[4] *278 Under the terms of the retirement plan, Mrs. DiPrete had vested rights as a beneficiary of the pension payments if Mr. Di-Prete predeceased her. Mrs. DiPrete also remained covered by the state's medical protection plan pursuant to G.L.1956 § 36-12-4.
The tranquility of Mr. DiPrete's retirement ended on March 29, 1994, when a grand jury returned a twenty-three count criminal indictment against him. Many of those counts related to Mr. DiPrete's abuse of his public office while governor. On December 11, 1998, Mr. DiPrete pled guilty to eighteen of the criminal counts in exchange for dismissal of the remaining five, admitting dishonorable conduct while holding office as governor. The counts to which Mr. DiPrete pled guilty included: violation of Racketeer Influenced and Corrupt Organizations Act (RICO), G.L. 1956 chapter 15 of title 7; conspiracy in violation of G.L.1956 § 11-1-6; solicitation or acceptance of bribe by agent, employee or public official in violation of G.L.1956 § 11-7-3; and extortion by a public official in violation of G.L.1956 § 11-42-1.1. As part of the plea agreement with the Attorney General, Mr. DiPrete agreed to three years incarceration, with one year to serve. The agreement further provided that "[n]o fines, restitutions or forfeitures [would] be imposed." The Superior Court accepted the plea arrangement and imposed the agreed upon sentence.
On January 14, 1999, the Retirement Board initiated this revocation action against Mr. DiPrete pursuant to PEPRRA. Thereafter, Mrs. DiPrete filed a separate complaint claiming her entitlement to all or a portion of the challenged pension and benefits pursuant to § 36-10.1-3. Mrs. DiPrete's case was never consolidated with Mr. DiPrete's, nor was she joined as a party to the revocation action against Mr. DiPrete. The two cases, however, were filed under the same case number, and the trial justice treated them as though they were one case.[5]
A nonjury trial was held on the Retirement Board's revocation claim on April 27, 1999. By that time, Mr. DiPrete had collected $372,162.65 in pension funds. Applying PEPRRA, the trial justice found that Mr. DiPrete had rendered dishonorable public service to the State of Rhode Island and violated the public trust reposed in him as governor by committing detestable crimes, thereby causing the public to suffer a great financial loss. Although he could have reduced Mr. Di-Prete's pension because of his conduct pursuant to PEPRRA, the trial justice decided instead to revoke the pension and retirement benefits in their entirety. Mr. DiPrete subsequently filed a motion to have his retirement contributions returned pursuant to § 36-10.1-4 and that motion was granted. Section 36-10.1-4 requires that retirement contributions paid to the retiree be returned if retirement benefits are reduced or revoked.
A separate bench trial was held to determine Mrs. DiPrete's entitlement to the revoked retirement benefits. Even though the trial justice made a specific finding *279 that Mrs. DiPrete was an innocent spouse and further found that she was unable to gain employment to support herself, he determined that she had adequate financial resources at her disposal and that she could not collect any portion of her husband's benefits and pension as permitted under § 36-10.1-3(d).
A single judgment reflecting the revocation of the benefits, the denials of Mrs. DiPrete's claim to the benefits and the return of Mr. DiPrete's contributions was entered in November 1999. Mr. and Mrs. DiPrete filed separate motions for new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure. The trial justice denied both motions in a single decision, concluding that his judgment was not affected by manifest error of law. All parties have appealed.

II

Revocation of Mr. DiPrete's Pension and Retirement Benefits
It has been said that "[g]ood laws are the products of bad morals."[6] PEPRRA was adopted because of the unfortunate misconduct of public officials. The General Assembly graciously opened the public coffers to those individuals who have served this state with honor and provided for pensions and other benefits to them and their spouses upon retirement. The General Assembly, however, wisely enacted PEPRRA to assure that the misdeeds of a distinct minority cannot continue to harm the citizens of this state. Knowing that he was accruing a pension and other retirement benefits while governor, Mr. DiPrete chose to mark his gubernatorial tenure with conduct that was deceitful, dishonest and corrupt. We will not require the Retirement Board of the State of Rhode Island to now reward Mr. DiPrete for his "service" to this state.

1. Applicability of PEPRRA

According to Mr. DiPrete, in P.L. 1996, ch. 292, the General Assembly expressed its intent that PEPRRA be applied "only to offenses" committed after August 6, 1996. Thus, he contends, because he committed all his crimes before that date, he is not subject to pension and benefit revocation under PEPRRA. After reviewing PEPRRA and P.L.1996, ch. 292, we, like the trial justice, disagree.
This Court conducts a de novo review of a Superior Court trial justice's statutory interpretation. Champlin's Realty Associates, L.P. v. Tillson, 823 A.2d 1162, 1165 (R.I.2003). Our ultimate goal in construing a statute is to give effect to the General Assembly's intent. Id. We presume that the General Assembly intended to attach significance to every word, sentence and provision of a statute. Id. When presented with a clear and unambiguous enactment, there is no room for statutory construction, and the statute will be literally applied, attributing the plain and ordinary meaning to its words. Interstate Navigation Co. v. Division of Public Utilities and Carriers, 824 A.2d 1282, 1287 (R.I.2003). When the statute is susceptible to more than one plausible interpretation, however, this Court will endeavor by every rule of statutory construction to ascertain the intent of the General Assembly. See State v. Cause, 478 A.2d 198, 201 (R.I.1984).
The General Assembly enacted PEPRRA in 1992 to provide the Retirement Board with a statutory mechanism to initiate *280 a civil action to revoke or reduce a public official/employee's retirement benefits whenever such person, after January 1, 1993; "is convicted of or pleads guilty or nolo contendere to any crime related to his or her public office or public employment." Section 36-10.1-3(b), as enacted by P.L. 1992, ch. 306, art. 1, § 8. In determining the appropriate sanction under PEPRRA, a trial justice is obligated to undertake a
"multi-factored analysis to decide` * * * [w]hether the retirement or other benefits or payments to which the public official or public employee is otherwise entitled should be revoked or diminished and, if so, * * * in what amount or by what proportion such revocation or reduction should be ordered.'" Retirement Board of the Employees' Retirement System of the State and City of Cranston v. Azar, 721 A.2d 872, 876 (R.I.1998) (quoting § 36-10.1-3(c)(1)(ii) and (iii)).
That determination must be made after considering the severity of the crime, any monetary loss suffered by the public as a result of the public official/employee's criminal acts, the degree of public trust reposed in the public official/employee and other factors as justice may require. Section 36-10.1-3(c).
In 1996, the General Assembly revisited the issue of pension revocation in P.L.1996, ch. 292. Chapter 292, entitled "An Act Relating to Retirement System  Pensions" (chapter 292 or the act), was put into effect to serve two functions. First, in § 1 of chapter 292, the General Assembly enacted G.L.1956 § 11-41-31 to authorize a trial justice to directly reduce or revoke a public official/employee's retirement benefits as part of a sentence imposed after a conviction or plea of guilty or nolo contendere to a criminal charge related to the official/employee's public office or employment. Such revocation or reduction under § 11-41-31 could be imposed without any action from the Retirement Board. "In determining whether the retirement or other benefit shall be revoked or reduced the court shall consider and make a finding" based on the same factors applicable to an action brought under PEPRRA, namely: the severity of the crime, the amount of loss suffered by the public as a result of the crime, the degree of public trust reposed in the public official/employee, and any other factors that justice may require. Section 11-41-31(B). If the court declines to disturb the retirement or other benefits pursuant to this section, "it shall order that the retirement or other benefits or payments be made to the public official or public employee." Id.
The second function of P.L.1996, ch. 292 was to amend PEPRRA to dovetail with the newly enacted § 11-41-31. Section two of chapter 292 recites § 36-10.1-3 in its entirety, as amended by the act. Without altering any of the existing provisions of PEPRRA, the General Assembly added language that directs the Retirement Board to institute revocation or reduction proceedings "if no finding is made by the judge in the criminal action pursuant to section 11-41-31." P.L.1996, ch. 292, § 2 (§ 36-10.1-3(B)).[7] The only other addition to PEPRRA made by chapter 292 is a tangential reference to § 11-41-31 in § 36-10.1-3(A), stating that a pension revocation or reduction must be done "in accordance with the provisions of this chapter, or section 11-41-31 if, after [January *281 1, 1993], such public official or public employee is convicted of or pleads guilty or nolo contendere to any crime related to his or her public office or public employment." P.L.1996, ch. 292, § 2 (§ 36-10.1-3(A)). (Emphasis indicates language added by P.L.1996, ch. 292, § 2.).
Mr, DiPrete's argument that PEPRRA cannot apply to him is based on language contained in § 3 of chapter 292. Public Law 1996, ch. 293, § 3 provides: "This act shall take effect upon passage and shall be applied only to those offenses which occur after the date of the passage of this act," which was August 6, 1996. This Court does not construe P.L.1996, ch. 292 to limit the applicability of PEPRRA by creating a window for a dishonorable public official to crawl through without accountability. Rather, it is apparent that the prospective nature of chapter 292 pertains only to the application of § 11-41-31 and the related provisions of PEPRRA added by the act.
There is no indication that the General Assembly intended to reduce the reach of PEPRRA through P.L.1996, ch. 292. To the contrary, throughout the amendatory process, the General Assembly retained the original mandate of PEPRRA that a post-January 1, 1993, plea or conviction shall result in pension revocation or reduction. The 1993 date would lose all force and effect if PEPRRA could not be applied to Mr. DiPrete, who pled guilty to his crimes in 1998.
Additionally, the General Assembly declared that "this act shall apply only to those offenses which occur after" August 6, 1996. P.L.1996, ch. 292, § 3. Chapter 292 dealt with two separate statutory schemes: PEPRRA and § 11-41-31. By limiting the time restriction in § 3 to "this act," the General Assembly referred only to the provisions enacted under chapter 292 itself. If the General Assembly intended to attribute a new effective date of PEPRRA then it specifically would have provided language to that effect. Rather, by saying that "this act" shall be limited to a certain time period, the General Assembly clearly intended that limitation to apply to chapter 292, which enacted § 11-41-31 and amended PEPRRA only to define when the Retirement Board must seek pension revocation.
Moreover, the focus of P.L.1996, ch. 292 was on the enactment of § 11-41-31, which provided yet another tool to revoke or reduce an errant official's pension. Chapter 292, as it pertains to PEPRRA, merely sets forth the instance when the Retirement Board is required to initiate the revocation or reduction action. The act does not affect the unaltered portions of PEPRRA. Provisions of an original act that are repeated in an amendment "are considered to be a continuation of the original law." 1A Statutes and Statutory Construction, § 22:33 at 392-93 (Norman J. Singer 6th rev. ed. 2000). "Thus, rights and liabilities accrued under the provisions of the original act [that] are reenacted are not affected by the amendment." Id. at 395-96. None of the substantive provisions of PEPRRA was altered by chapter 292. The unaltered portions of PEPRRA became the law when it was enacted in 1992 (P.L.1992, ch. 306, art. 1, § 8) and remained law after the enactment of P.L. 1996, ch. 292. Consequently, P.L.1996, ch. 292 has no bearing on Mr. DiPrete's liability under PEPRRA as it existed before minor amendments. He is subject to pension revocation as a result of his 1998 pleas.

2. Preclusion

Next, Mr. DiPrete contends that, by virtue of the 1998 plea agreement, the Retirement Board was collaterally and equitably estopped from bringing this revocation action. Both of those estoppel arguments *282 are based on language in the plea agreement that provided that "no fines, restitution or forfeitures" would be imposed. According to Mr. DiPrete, the Retirement Board cannot attempt to revoke his pension "after explicitly agreeing not to do so." We are of the opinion that no such agreement was made.

Collateral estoppel
Under the doctrine of collateral estoppel, also known as issue preclusion, certain legal and factual issues litigated and resolved in a previous action may not be relitigated in a subsequent action. See Ferguson v. Marshall Contractors, Inc., 745 A.2d 147, 154 (R.I.2000). Collateral estoppel will apply if there is "(1) an identity of issues; (2) a final judgment on the merits; and (3) an establishment that the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior action." Id. (quoting Providence Teachers Union, Local 958, American Federation of Teachers, AFLCIO v. McGovern, 113 R.I. 169, 172, 319 A.2d 358, 361 (1974)).
In determining whether the Retirement Board is attempting to relitigate an issue that already was decided in Mr. DiPrete's criminal case, this Court considers "three factors: (1) the issue sought to be precluded must be identical to the issue determined in the earlier proceeding, (2) the issue must actually have been litigated in the prior proceeding, and (3) the issue must necessarily have been decided." E.W. Audet & Sons, Inc. v. Fireman's Fund Insurance Co., 635 A.2d 1181, 1186 (R.I.1994).
It is apparent that collateral estoppel does not apply to this case in the manner that Mr. DiPrete argues  specifically, for the proposition that the issue of pension revocation was resolved during the criminal stage and, therefore, that issue cannot now be "relitigated." Mr. DiPrete's criminal case ended when he entered his plea of guilty. Thus, no issues actually were decided by a finder of fact after trial and, consequently, the Retirement Board was not collaterally estopped from litigating any issues that may have arisen in the criminal case. Id.; see also Gall v. South Branch National Bank of South Dakota, 783 F.2d 125, 127 (8th Cir.1986) (noting that collateral estoppel is "premised on a finding that there has been an adjudication on the merits in a prior proceeding").
The resolution of the criminal case against Mr. DiPrete, however, does have some significance to this revocation action. The judgment of conviction entered against Mr. DiPrete on the RICO violation "shall estop [him] from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the state." Section 7-15-4(d).[8]See also United States v. Benson, 579 F.2d 508, 509 (9th Cir.1978) (noting that a guilty plea "conclusively admits all factual allegations of the indictment"). By virtue of his plea, the "essential allegations of the criminal offense" were conclusively established against Mr. DiPrete in this revocation action and thus satisfies the requirements of § 7-15-4(d).
The consequence of the plea, however, was determined by the state and Mr. Di-Prete in the plea agreement that was accepted *283 by the trial justice. Assuming the plea agreement specifically provided that Mr. DiPrete's pension would not be revoked, preclusion of this revocation action would be a consequence of the agreement between him and the state; preclusion would not be the result of collateral estoppel. See Restatement (Second) Judgments § 27 cmt. e at 269 (1982) (describing that a "stipulation or consent judgment may have preclusive effect in a subsequent action if the parties have so agreed. * * * In such a case the effect " results not from [the doctrine of collateral estoppel] but from an agreement manifesting an intention to be bound."). Under this logic, we consider whether the Retirement Board was prevented from initiating this revocation action because of a previous agreement not to do so.

Plea Agreement
A plea agreement is a contract between the defendant and the prosecuting body. See United States v. Conway, 81 F.3d 15, 17 (1st Cir.1996). Accordingly, such an agreement will be interpreted pursuant to the law of contracts. See United States v. Kamer, 781 F.2d 1380, 1387 (9th Cir.1986). The remedy for a breach of a plea agreement is either "withdrawal of the plea or enforcement of the plea bargain agreement." State v. Freeman, 115 R.I. 523, 535, 351 A.2d 824, 830 (1976). Thus, if it were demonstrated that the Retirement Board was bound by the terms of the plea agreement, and the agreement provided that Mr. DiPrete's pension would not be revoked, Mr. DiPrete could specifically enforce the agreement against the Retirement Board.
We are of the opinion that the state, in entering the plea agreement, did not agree to refrain from seeking pension revocation. When interpreting a contract, our primary goal is to ascertain the intent of the parties. D.T.P., Inc. v. Red Bridge Properties, Inc., 576 A.2d 1377, 1381 (R.I. 1990). To that end, the words used in the contract are to be given their plain and ordinary meaning. Id. "On the other hand, the situation of the parties and the circumstances attending the speaking of the words used in a contract also are relevant to a determination of their intended meaning." Westinghouse Broadcasting Co. v. Dial Media, Inc., 122 R.I. 571, 581, 410 A.2d 986, 992 (1980).
The question of whether the plea agreement addressed pension revocation turns on the interpretation of the term "forfeitures" as it was used in the agreement. The trial justice correctly concluded that the term forfeitures related only to forfeitures permitted under RICO. Under a dictionary definition of the term, forfeiture refers to "the act of forfeiting: the loss of property or money because of a breach of a legal obligation." Merriam-Webster's Collegiate Dictionary 457 (10th ed. 1993). The circumstances surrounding this plea agreement, however, indicate that a more precise definition must be attributed to the term. The charges levied against Mr. DiPrete alleged violations of the RICO statute. The RICO statute specifically provides for criminal and civil forfeiture actions. Sections 7-15-3.1 and 7-15-4. Mr. DiPrete entered into this plea agreement after months of intense negotiations with the attorney general. Given the nature of the charges pending against Mr. DiPrete and the context of the plea agreement, it is apparent that the term "forfeitures" pertains to the possibility of forfeiture under RICO. See id.
Mr. DiPrete presents various reasons why, in his opinion, the word "forfeitures" should not be so limited. The thrust of his arguments is that the state did not comply with the requirements of forfeiture under the RICO statute and, therefore, the agreement did not contemplate forfeiture *284 under RICO. Specifically, he contends that the state failed to "set forth with reasonable particularity the property that the Attorney General seeks to forfeit" as is required by § 7-15-3.1(a), In a related argument, Mr. DiPrete contends that, because a dollar amount never was attributed to his crimes, the state cannot argue that the plea language is related to a RICO forfeiture. Although he fails to cite any statutory provision that would require such an attribution from the state, Mr. DiPrete apparently is referring to § 7-15-3(a)(3), which provides that "the value of the property forfeited shall not exceed the sum of the money invested in violation of § 7-15-2(a) plus the appreciated value of the money." Both Mr. DiPrete's arguments are unpersuasive for the simple reason that the state agreed that no RICO forfeitures would be imposed. Thus, the state was under no obligation to comply with the requirements of RICO's forfeiture provisions. Accordingly, the state's compliance with RICO is of no significance to our interpretation of the term "forfeitures" as it is used in the plea agreement.
Mr. DiPrete additionally argues that because the term "forfeitures" is used in the plural, he and the state intended the term to be all-encompassing and include pension revocation under PEPRRA. We believe that if the state and Mr. DiPrete truly intended to settle the possibility of pension revocation, they would have expressly done so. Mr. DiPrete asserts that he anticipated and sought to avoid this revocation action, "which is why the plea agreement contained the provision that no fines, restitutions or forfeitures would be imposed." There is no indication that Mr. DiPrete conveyed that intent to the state or to the court below. The secret intent of one party to a contract is not binding on the other party. See 3 Corbin on Contracts § 538 (1960 and Supp. 1992). Thus, whatever significance Mr. DiPrete may have secretly intended to attribute to the word "forfeitures" does not control our interpretation of that term.
Because we conclude that the plea agreement did not resolve the issue of pension revocation under PEPRRA, we need not consider whether the Retirement Board would be bound by such a contract.

Equitable Estoppel
Under the doctrine of equitable estoppel, a party may be precluded from enforcing an otherwise legally enforceable right because of previous actions of that party. See El Marocco Club, Inc. v. Richardson, 746 A.2d 1228, 1233 (R.I. 2000). It is well settled that equitable estoppel will apply when there is:
"an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and secondly, that such representation or conduct in fact did induce the other to act or fail to act to his injury." Id. (quoting Providence Teachers Union v. Providence School Board, 689 A.2d 388, 391-92 (RI. 1997)).
Like his collateral estoppel argument, Mr. DiPrete's equitable estoppel argument is based on the statement in the plea agreement that prevented forfeitures. As discussed above and because there was no specific affirmative representation that the pension would not be revoked, Mr. Di-Prete's equitable estoppel argument fails.

3. Failure to Join an Indispensable Party

Next, Mr. DiPrete contends that the trial justice erred by refusing to dismiss the revocation action against him pursuant to Rule 12(b)(7) of the Superior *285 Court Rules of Civil Procedure, which provides for dismissal of a case for failure to join an indispensable party. According to Mr. DiPrete, his wife has a vested interest in his pension and she, in reliance on the pension benefits, altered her behavior with the expectation that she would continue to receive those benefits. Thus, he argues, because a reduction or revocation of Mr. DiPrete's benefits would have a significant impact on Mrs. DiPrete, the trial justice was obligated to join her as an indispensable party. We reject his argument.
In determining whether a party is indispensable to an action, we must consider Rule 19(a) of the Superior Court Rules of Civil Procedure, which provides that a party must be joined if:
"(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the person's claimed interest."
This Court has adopted a "pragmatic approach" to determine whether a party is in fact indispensable to an action. Doreck v. Roderiques, 120 R.I. 175, 179, 385 A.2d 1062, 1064 (1978). Under this approach, there is no fixed formula for determining whether a party is indispensable. Id. To provide guidance in making that determination, however, this Court has favored the following description of indispensable parties.
"[T]rue indispensable parties are only those whose interests could not be excluded from the terms or consequences of the judgment and leave anything, or appreciably anything, for the judgment effectively to operate upon, as where the interests of the absent party are inextricably tied in to the cause * * * or where the relief really is sought against the absent party alone." Id. at 180, 385 A.2d at 1065 (quoting Stevens v. Loomis, 334 F.2d 775, 777 (1st Cir.1964)).
The most important factor in determining whether a party is indispensable is "whether a judgment entered in the case may have `separable affirmative consequences with respect to parties before the court.'" Id.
In applying the pragmatic approach sanctioned by this Court, we are of the opinion that Mrs. DiPrete was not an indispensable party to the revocation action brought against Mr. DiPrete. First, the revocation action brought against Mr. Di-Prete was not merely a pretext to a revocation that really was sought against Mrs. DiPrete alone. See id. Second, Mrs. Di-Prete's rights to the pension and retirement benefits were not inextricably tied to the Retirement Board's action for revocation asserted against Mr. DiPrete. See id. To the contrary, in the event that Mr. DiPrete's pension were revoked or reduced, Mrs. DiPrete could continue to collect the benefits under PEPRRA. Section 36-10.1-3(d) provides in pertinent part:
"If the superior court determines that the retirement or other benefits or payments of a public official or public employee should be revoked or reduced under this chapter, it may, in its discretion and after taking into consideration the financial needs and resources of any innocent spouse * * * order that some or all of the revoked or reduced benefits or payments be paid to any innocent spouse * * * as justice may require."
Under this provision, it is apparent that the joinder of Mrs. DiPrete is not the sine qua non of a proper revocation action against Mr. DiPrete. Mrs. DiPrete's rights could have been, and in fact were, *286 fully litigated pursuant to § 36-10.1-3(d) after the decision to revoke her husband's pension. Mrs. DiPrete's interest was completely severable from Mr. DiPrete's interest and, accordingly, her participation in the revocation action would be of no consequence to either her or Mr. DiPrete.
Furthermore, all the factors relevant to pension revocation or reduction under PEPRRA focus on Mr. DiPrete's conduct. Thus, her joinder, to the action did not affect Mr. DiPrete's ability to contest the Retirement Board's attempts at revocation. Additionally, Mrs. DiPrete's absence would not create a possibility of subjecting Mr. DiPrete to double, multiple or inconsistent obligations.
In arguing that the case should have been dismissed as a consequence of the trial justice's failure to join Mrs. Di-Prete, Mr. DiPrete also relies on G.L.1956 § 9-30-11. Under § 9-30-11, "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration * * *." Dismissal of the action against Mr. DiPrete is not required under that section for two reasons. First, the trial justice applied PEPRRA to revoke his pension and, in doing so, he did not issue a declaratory judgment. Second, even if the decision against Mr. DiPrete were construed as a declaratory judgment, as discussed above, such a declaration would have no effect on Mrs. DiPrete individually because her interest in the pension was protected under § 36-10.1-3(d). In fact, there were two separate actions to adjudicate the respective rights of the husband and wife.
Accordingly, the trial justice did not err in refusing to join Mrs. DiPrete to this revocation action against Mr. DiPrete.

4. Failure to State a Claim Upon Which Relief Can be Granted

Mr. DiPrete also avers that the trial justice erred by failing to dismiss count two of the Retirement Board's complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Under count two of its complaint, the Retirement Board sought a declaratory judgment that Mr. DiPrete did not render honorable service. The Retirement Board apparently sought that declaration in connection with its attempt to revoke Mr. DiPrete's retirement benefits under the common law.
When reviewing a trial justice's ruling on a motion to dismiss pursuant to Rule 12(b)(6), "this Court examines the allegations contained in the * * * complaint [and] assumes them to be true." Ellis v. Rhode Island Public Transit Authority, 586 A.2d 1055, 1057 (R.I.1991). Dismissal pursuant to the motion is appropriate only when "it is clear beyond a reasonable doubt that * * * plaintiff would not be entitled to relief under any set of facts that could be proven." Id.
Mr. DiPrete correctly states that PEPRRA was enacted with the specific purpose of abrogating the common law's scheme of pension revocation. See Azar, 721 A.2d at 876. Consequently, PEPRRA is the only mechanism for revoking a public official/employee's retirement benefits. Thus, to the extent that the Retirement Board may have relied on the common law to revoke his retirement benefits, Mr. Di-Prete correctly avers that such a complaint should be dismissed.
The Retirement Board, however, also sought revocation of Mr. DiPrete's benefits pursuant to PEPRRA in count one of its complaint. Moreover, the trial justice specifically applied PEPRRA to revoke Mr. DiPrete's pension. Indeed, the *287 Superior Court decision revoking his pension indicates that jurisdiction was conferred upon the court pursuant to PEPRRA, the trial was conducted pursuant to PEPRRA, and the trial justice went on to analyze the case specifically under all of PEPRRA's requirements. Thus, any error in failing to dismiss count two against Mr. DiPrete is harmless.

5. The Relationship Between PEPRRA and G.L.1956 § 36-8-20

In 1994, the General Assembly enacted G.L.1956 § 36-8-20 (P.L.1994 ch. 87, § 1), a preferred tax treatment statute entitled "Internal Revenue Code qualification." That section was designed with the intent of conforming the state's retirement system to the requirements of 26 U.S.C. § 401(a) of the federal Internal Revenue Code (code) to maintain certain federal tax qualifications. To that end, § 36-8-20(a) expressly declares that its provisions "shall supersede any conflicting provisions of chapters 8-10 of this title, of chapter 16 of title 16, or of chapter 21 of title 45."
Mr. DiPrete contends that PEPRRA is superseded by § 36-8-20, the preferred tax treatment statute. Specifically, he cites § 36-8-20(e), which requires that retirement "[d]istributions shall begin to be made not later than the employee's required beginning date as defined under § 401(a)(9) of the code and shall be made in accordance with all other requirements of that code section." According to Mr. DiPrete, the code does not allow the distribution of benefits to be withheld because of an individual's dishonorable service. Thus, he argues, because PEPRRA attaches a condition of honorable service to the right to collect pension benefits, PEPRRA conflicts with the code, threatens the preferred tax status of the retirement system and is, therefore, superceded by § 36-8-20. We disagree.
Even assuming that PEPRRA would jeopardize the tax benefits otherwise available to the state's retirement system,[9] it is clear that the General Assembly, by enacting § 36-8-20, had no intention of gutting PEPRRA. The General Assembly in § 36-8-20(a) specifically identified "chapters 8-10 of this title, of chapter 16 of title 16, or of chapter 21 of title 45" as the statutory provisions susceptible to super-session by § 36-8-20. Guided by the maxim expressio unis est exclusio alterius, which provides "the expression of one thing is the exclusion of another," In re Advisory Opinion to the House of Representatives, 485 A.2d 550,555 (R.I.1984), we are of the opinion that General Assembly had no intention of superseding PEPRRA because PEPRRA is codified in chapter 10.1 of title 36. Consequently, because that chapter is not identified in § 36-8-20(a), the General Assembly is presumed to have left PEPRRA intact.
Additionally, since § 36-8-20 was enacted, the General Assembly has devoted significant effort to the issue of pension revocation. It is presumed that the General Assembly knows the " `state of existing relevant law when it enacts or amends a statute.'" Smith v. Retirement Board of the Employees' Retirement System, 656 A.2d 186, 189 (R.I.1995). Specifically, as discussed, two years after § 36-8-20 was enacted, § 11-41-31 was enacted and PEPRRA was amended. The General Assembly also made amendments to PEPRRA in 1997. See P.L.1997, ch. 326, § 1 (making stylistic changes to PEPRRA). If the General Assembly intended to negate the possibility of pension revocation or reduction under PEPRRA for the sake of tax *288 benefits under § 36-8-20, then the General Assembly would not have gone through the effort of enacting § 11-41-31 in 1996 or amending PEPRRA in 1996 and 1997, subsequent to the 1994 enactment of the preferred tax treatment statute, § 36-8-20.
Because there is no indication that the General Assembly intended to weaken the provisions of PEPRRA indirectly through § 36-8-20, we hold that PEPRRA is not superseded by that section.

6. New Trial

Next, Mr. DiPrete contends that the trial justice erred in refusing to grant a new trial concerning the pension revocation. In an action tried without a jury, a new trial may be granted "for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of this state." Super. R. Civ. P. 59(a)(2). Interpreting this rule,
"this Court has held that a trial justice sitting without a jury may grant a new trial only `(1) if there is an error in the judgment that is manifest on the face of the record without further examination of matters of fact or evidence; or (2) if the trial justice is satisfied that newly discovered evidence has come forward which was not available at the first trial and is of sufficient importance to warrant a new trial.'" Bernier v. Lombardi, 793 A.2d 201, 202 (R.I.2002) (per curiam) (quoting Anthony v. Searle, 681 A.2d 892, 898-99 (R.I.1996)).
This Court will not disturb a trial justice's factual findings unless it is demonstrated that, in arriving at those findings, "the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." Id. at 203 (quoting Technology Investors v. Town of Westerly, 689 A.2d 1060, 1062 (R.I.1997)).
Applying PEPRRA's required multifactored analysis, the trial justice was completely within his discretion to revoke, and correctly revoked, Mr. DiPrete's pension in its entirety. There is no question that Mr. DiPrete rendered dishonorable service to the State of Rhode Island. Mr. DiPrete pled guilty to eighteen felony counts arising from his service as governor of this state. The severity of the crimes committed by Mr. DiPrete while in that capacity is remarkable and perhaps unprecedented in this state. As the trial justice aptly described: "no greater crime could be committed by the highest public official in any state than to have that public official violate the trust reposed in him by the electorate by taking bribes and kickbacks."[10] The financial loss suffered by this state as a result of Mr. DiPrete's criminal acts equaled, if not exceeded, $300,000. The nature of Mr. DiPrete's criminal conduct was especially serious when considering the degree of public trust reposed in him as the highest public officer of this state. Given these facts, the trial justice quite properly imposed a complete revocation of Mr. DiPrete's retirement benefits rather than order a reduction of benefits.
Mr. DiPrete contends the trial justice erroneously overlooked factors that, in the interest of justice, he was required to consider before revoking Mr. DiPrete's pension and benefits. See § 36-10.1-3(c)(2)(v) (requiring the trial justice to consider "rainy such other factors as, in the *289 judgment of the superior court, justice may require"). Specifically, Mr. DiPrete complains that he was forced to spend $1.2 million to expose the state's prosecutorial misconduct in bringing his criminal case to trial. Mr. DiPrete also faults the trial justice for not considering the combined seventeen and one-half years of supposedly honorable service he gave to the United States Navy and to the City of Cranston as mayor, a member of the city council, and a member of the school committee before becoming `governor.[11] None of these factors, however, outweighs the contemptibility of Mr. DiPrete's intentional actions that were the catalyst for this revocation action. Further, Mr. DiPrete agreed to waive a claim for attorney's fees incurred as a result of the state's prosecutorial misconduct in exchange for a more favorable sentence under the plea agreement. Additionally, PEPRRA does not absolutely require a trial justice to compare a period of dishonest service with a period of otherwise honorable service. See Azar, 721 A.2d at 875 (holding that a trial justice need not "subtract those years of dishonorable service from the employee/official's overall years of public employment because they were proven to be dishonorable"). Accordingly, the trial justice did not overlook or misconceive material evidence when revoking Mr. DiPrete's pension. Because we discern no error on the face of the judgment or in the trial justice's findings, we conclude that the trial justice correctly revoked Mr. DiPrete's retirement benefits and appropriately denied his motion for new trial.

III

Mrs. DiPrete's Right to Continue Collecting Pension and Other Benefits as an Innocent Spouse Under § 36-10.1-3(d)
Although all parties agreed and the trial justice found that Mrs. DiPrete is an innocent spouse under § 36-10.1-3, the trial justice ruled that she was not entitled to continue collecting any of the pension benefit that had been vested in her husband until revocation. We are of the opinion that the trial justice abused his discretion when he denied Mrs. DiPrete any interest in the revoked benefits, despite her significant familial contributions and the absence of any wrongdoing on her part. The trial justice erred by overlooking the significance of the economic partnership theory of marriage and its relationship to § 36-10.1-3(d). The trial justice also improperly drew an adverse inference against Mrs. DiPrete and failed to make all findings of fact necessary to determine justice.
Section 36-10.1-3(d) provides in pertinent part:
"If the superior court determines that the retirement or other benefits of payments of a public official or public employee should be revoked or reduced under this chapter, it may, in its discretion and after taking into consideration the financial needs and resources of any innocent spouse, * * * order that some or all of the revoked or reduced benefits or payments be paid to any innocent spouse * * * as justice may require."
*290 Under the plain language of this section, needs and resources of the innocent spouse are a consideration, but not the determinative factor. Rather, PEPRRA predicates an innocent spouse's right to continue collecting revoked benefits on the interest of justice. Id. It cannot be denied that there is a distinction between law and justice and that the distinction is not merely a matter of semantics. Law is an assemblage of rules developed through court rulings and legislative enactments. Justice, On the other hand, is based on the integral relationship between people and these rules.
If justice is to be done, no court can overlook an innocent spouse's entitlement to retirement benefits based on his or her familial contributions and the economic partnership theory of marriage, which is firmly established in this state. See Stevenson v. Stevenson, 511 A.2d 961, 964 (R.I.1986) ("The courts now recognize that marriage is, among other things, an economic partnership between two people striving to make a better life for themselves."). The economic partnership theory of marriage has been a guiding principle for the equitable distribution of marital assets in this state for decades. In reviewing the trial justice's decision in this case, we look in part to this Court's discussion of pension and retirement benefits in the context of divorce proceedings. Although none of these cases addresses the precise issue before us, we find the underlying rationale no less compelling when considering the rights of an innocent spouse within the context of a pension revocation proceeding.
It is well settled in Rhode Island that a spouse's pension is marital property subject to equitable distribution. It is worth quoting at length our discussion in Stevenson, 511 A.2d at 964-65, in which we concluded that:
"The law in other equitable-distribution and community-property jurisdictions and the scholarly literature exploring this issue reveals nearly unanimous support for the proposition that pension funds are marital property. See, e.g., Johnson v. Johnson, 131 Ariz. 38, 638 P.2d 705 (1981); Van Loan v. Van Loan, 116 Ariz. 272, 569 P.2d 214 (1977); In re Marriage of Brown, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (1976); Kuchta v. Kuchta, 636 S.W.2d 663 (Mo. 1982); Kullbom v. Kullbom, 209 Neb. 145, 306 N.W.2d 844 (1981); Kikkert v. Kikkert, 88 N.J. 4, 438 A.2d 317 (1981); Kruger v. Kruger, 73 N.J. 464, 375 A.2d 659 (1977). Troyan, Pension Evaluation and Equitable Distribution 10 Fam. L. Rptr. (BNA) 3001 (Nov. 22, 1983). (For a general overview of this issue, see Annot. 94 A.L.R.3d 176 (1979) and cases there cited.) The majority of authorities have rejected arguments that a pension fund is a mere expectancy or gratuity, especially in cases such as this, where the pension fund is contributory and fully vested. Rather, the consensus is that a pension represents delayed compensation for work performed over the course of the marriage; as such it is a `chose in action' or an enforceable contract right and therefore a form of property. One treatise explains the rationale in the weight of authority as follows:
`To the extent earned during the marriage, the benefits represent compensation for marital effort and are substitutes for current earnings which would have increased the marital standard of living or would have been converted into other assets divisible at dissolution. Subjecting the benefits to division is just, because in most cases the retirement benefits constitute the most valuable asset the couple has acquired and they both have *291 relied upon their pension payments for security in their older years.' 3 Rutkin, Family Law and Practice, § 37.07[1] at 37-81 (1985)."
On several occasions, we have analogized a pension to a "forced savings account whose funds will become available to the parties upon retirement." Stevenson, 511 A.2d at 965; see also Allard v. Allard, 708 A.2d 554, 557 (R.I.1998); Thompson v. Thompson, 642 A.2d 1160, 1164 (R.I.1994); Furia v. Furia, 638 A.2d 548, 552 (R.I. 1994); Moran v. Moran, 612 A.2d 26, 33 (R.I.1992). The purpose of a retirement pension, we have held, is "to provide for the family in the future." Thompson, 642 A.2d at 1164.
Given the purpose of a retirement pension, this Court has held that a pension is subject to division upon divorce despite a statutory provision that exempted such pensions from attachment or assignment. Moran, 612 A.2d at 33. This holding was based on the rationale that
"a family loses its ability to spend a portion of its income when that income is deferred and placed in a pension. It would be terribly unfair to read an exemption statute, which was created to protect a pension for the benefit of a retired employee's family, in such a way that the exemption would bar children or a former spouse from receiving support from the very fund created for their benefit, and would once again deny them the benefits of the income they sacrificed to a pension years before." Id. (quoting Young v. Young, 507 Pa. 40, 488 A.2d 264, 269 (1985)).
Of particular import to the present analysis is the case of Allard, in which the issue was whether a disability pension representing an employed spouse's vested retirement pay earned during the marriage should be subject to distribution. Recognizing the importance of retirement pay to both parties to a marriage, we held that a disability pension that effectively functions as a retirement plan is subject to distribution. Allard, 708 A.2d at 558. We held that one party to a marriage should not be allowed to defeat his or her spouse's interest in an asset, such as retirement income, earned during the marriage by invoking a condition solely under that party's control. Id. To hold otherwise would be to deprive a spouse of her interest in a "retirement pension that for over eighteen years had been funded by the parties' marital assets. Such an outcome runs counter to our recognition that marriage is, among other things, an economic partnership and that pension benefits can be one of the largest assets of that partnership." Id.
We also recognized a non-employee spouse's interest in retirement benefits in Furia. Furia involved a divorce proceeding in which the wife was a fully vested member of the state retirement system and eligible to receive immediate benefits by virtue of over twenty-eight years of service as a public school teacher. Furia, 638 A.2d at 550. She did not wish to retire, however. Both parties wanted the husband to receive a portion of the pension benefits by means of a Qualified Domestic Relations Order before the wife retired. Id. We opined that the husband was "entitled to collect the value of his portion of the pension benefits" before the wife retired, but not the pension benefits per se. Id. at 552. "Indeed, he is not a member of the plan, but his right to collect any of the plan's benefits exists only by virtue of his relationship with a member." Id. We also noted that "the employee/spouse should not unilaterally deprive the nonemployee/spouse of his or her property if the Family Court decides to award a portion of the pension to the nonemployee/spouse." Id. at 553. (Emphasis added).
*292 Although the cases referred to above reveal that an innocent spouse has a cognizable property interest in a vested pension, such an interest is derivative in nature. Id. So, too, Mrs. DiPrete's interest in the pension as a spouse, innocent though she may be, derives from Mr. Di-Prete's status as a member of the state retirement system. The derivative nature of that interest is significant given that § 36-10.1-3(a) also provides that any conviction or plea of guilty or nolo contendere to a crime relating to public office "shall be deemed to be a breach of the public officer's or public employee's contract with his or her employer." Thus, we conclude that a public official's years of dishonorable service do have some relevance in determining an innocent spouse's interest in a revoked pension.
To reconcile the economic partnership theory of marriage and the derivative nature of a spouse's interest in retirement benefits with the interest of justice referred to in § 36-10.1-3(d), we hold that the inquiry under that section must be segregated into discrete time frames. To the extent that a public official's pension is based on service rendered before his or her criminal activity, we hold that an innocent spouse has an interest that must be recognized under PEPRRA. Absent compelling circumstances, the innocent spouse cannot be deprived of his or her interest in the retirement benefits earned during this period. Because of the derivative nature of the spouse's interest, however, justice does not require a presumption of a right to continue collecting pension and benefits to the extent that they were enhanced by the employee's years of dishonorable service.
The segregation of the PEPRRA inquiry relative to an innocent spouse is grounded in policy considerations. We have long since relegated to the vaults of jurisprudential arcana the maxim: Uxor non est sui juris sed sub potestate viri. "A wife is not in her own right (i.e., she cannot act independently), but under the power of her husband." Black's Law Dictionary 1697 (7th ed. 1999). Or, more loosely translated, "a husband and wife are one, and he's the one." Absent a showing of complicity, no person should be penalized for the criminal actions of the spouse. Just as the sins of the father shall not be visited upon the son;[12] they should not be visited upon an innocent spouse.
Also, a holding that an innocent spouse could be completely divested of his or her interest in a pension might serve as an incentive for an innocent spouse to file for divorce, upon learning that his or her marital partner has been charged with criminal activity, in an effort to salvage his or her interest in the pension. It is clearly not the policy of this state to implicate the Retirement Board, the Superior Court, the Family Court, this Court, or indeed any arm of government in such uniquely private concerns of its citizens or to encourage divorce for such a purpose as insuring that one spouse receives a portion of the other spouse's pension.
With respect to benefits attributable to a dishonorable period of service, we discern nothing in the language of § 36-10.1-3(d) that would prohibit the court from awarding some or all of the total benefits to an innocent spouse. But such an award would be an act of discretion to be exercised under the statute; it is not a property interest to which the innocent spouse is presumptively entitled.
*293 In this case, Mr. DiPrete, with the support of Mrs. DiPrete, had accumulated credit toward a pension until he retired in 1991. The record indicates that Mr. Di-Prete had accumulated seventeen and one-half years, of credit toward a pension before becoming governor and his concomitant years of dishonorable service. These credits represented his tenures as mayor and member of both the city council and school committee for the City of Cranston, as well as his service in the United States Navy. The pension benefits attributable to those years of municipal employment and military service had vested, and were payable at such time as he attained the age of sixty. The criminal charges to which he pled guilty did not encompass these years, nor indeed was he ever charged, much less convicted, of any crime relating to his municipal service.
Moreover, not only is it undisputed that Mrs. DiPrete is an innocent spouse, but also the trial justice specifically recognized her contributions to the people of this state. As the trial justice said, "[t]he evidence supports a finding that as First Lady of the State of Rhode Island, Patricia DiPrete was extraordinary in her graciousness and for her support of various charitable enterprises such as a homeless shelter for women in South Providence and a strong advocate for education about human sexuality during the AIDS crisis." Those contributions militate in favor of allowing her to collect her fair share of the revoked benefits.
Under the theory of marital partnership, the contributions to the pension reflect the joint economic effort of both spouses. Under this Court's precedents, (and those of other jurisdictions), Mrs. DiPrete held an interest in that property, no less than Mr. DiPrete did, based upon her contributions to the marriage. She raised their children and maintained their household while her husband tended to his real estate and insurance business and while he pursued his political career in the City of Cranston and as governor. It does not stretch the imagination to assume that if she had filed for divorce, she would have been awarded the value of her equitable portion of his pension under the reasoning of Furia. Should she be adversely affected by a decision to stay married to Mr. DiPrete? By failing to give adequate regard to the economic partnership theory of marriage and Mrs. DiPrete's property interest in the benefits earned through her familial contributions, the trial justice improperly diluted the importance of justice in determining her rights to the revoked benefits.
In determining the amount of benefits that should be awarded, the trial justice also is required to consider the "needs and resources of any innocent spouse." Section 36-10.1-3(d). Without specifically making a finding of her needs, the trial justice rejected her request to continue collecting a portion of the benefits because the trial justice believed her financial needs could be satisfied with adequate resources available to her.
As the trial justice correctly stated: "One can neither adequately nor intelligently consider `needs' without also considering available `resources.'" The trial justice found that Mrs. DiPrete no longer is employable as a nurse, her trained profession. Nor was she employable in any other capacity. Evidence before the court indicated that, at the time of the hearing, Mrs. DiPrete had approximately $1,000 in her checking account, and no savings from which to draw. She did not own a vehicle, and there was an outstanding equity loan of $100,000. Neither she nor her husband were collecting Social Security. Thus, the trial justice found, Mrs. DiPrete is "in need of pension or other benefits."
*294 Despite her financial status, the trial justice found that Mrs. DiPrete's needs could be met with alternate resources available to her and, therefore, she did not need any of the revoked pension benefits. In so finding, the trial justice pointed to evidence that she and Mr. DiPrete had $225,000 in real property. He also cited evidence that Mr. DiPrete had a 44.59 percent interest in Frank DiPrete Realty Co., Inc. (DiPrete Realty). According to expert testimony, the value of Mr. Di-Prete's interest in DiPrete Realty was between $350,000 and $500,000. These resources available to the DiPretes, the trial justice concluded, obviated Mrs. DiPrete's need to continue collecting any portion of the revoked retirement benefits.
Recognizing that Mrs. DiPrete sought continuation of retirement benefits rather than welfare benefits, we believe that the trial justice committed clear error in finding that Mrs. DiPrete did not need the financial assistance provided by the revoked benefits. In arriving at his finding, the trial justice failed to offer any ruling on Mrs. DiPrete's living expenses. This failure skewed the required analysis under PEPRRA. The omission is troubling given the clear evidence provided by accountant, John S. Renza, C.P.A. (Renza). Renza explained that, if Mrs. DiPrete continued to live in the marital home, her yearly living expenses would be $50,000. Even if she sold the home, Renza testified, her yearly expenses would be $30,000. Without explanation, and despite finding that Mrs. DiPrete was unemployable in any capacity and had little money, the trial justice failed to take these yearly expenses into account.
Not only did the trial justice fail to make all necessary findings of fact, but also his determination of resources available to Mrs. DiPrete was flawed. He based his conclusion that Mrs. DiPrete's financial needs could be met with available resources in part on an adverse inference drawn against her for failing to call Mr. DiPrete as a witness. This Court has held that "a litigant's unexplained failure to produce an available witness who would be expected to give material testimony in [sic] the litigant's behalf permits, but does not compel, a factfinder to draw an inference that had the witness testified, the testimony would have been adverse to the litigant." Belanger v. Cross, 488 A.2d 410, 412-13 (R.I.1985). This empty-chair doctrine, however, must be applied with great caution. Id.; see also Avarista v. Aloisio, 672 A.2d 887, 892 (R.I.1996). Before a negative inference may be drawn in such a situation, it must be demonstrated that the missing witness was available to the person who would be expected to call the witness. Belanger, 488 A.2d at 412-13.
The trial justice erred by drawing an adverse inference against Mrs. DiPrete in this case because Mr. DiPrete was not an "available" witness. "If a witness's absence can be satisfactorily explained, no [adverse] inference is permitted." State v. Blair, 117 Wash.2d 479, 816 P.2d 718, 723 (1991). If a witness is not competent to testify, or another privilege applies to protect the witness's testimony, the witness is not "available" as required by the empty-chair doctrine. Id. When called to the stand by the Retirement Board, Mr. DiPrete testified that upon advice of counsel he would exercise his right under the Fifth Amendment to the United States Constitution and refused to answer any questions involving his income or finances.[13] Mrs. DiPrete's decision to forgo *295 calling her husband was not made in a vacuum. Mr. DiPrete already had refused to testify at the request of the Retirement Board. Obviously, Mr. DiPrete would refuse to answer these same questions even if his wife called him as a witness. To avoid application of the empty-chair doctrine, Mrs. DiPrete was not required to hale Mr. DiPrete into court from prison only to hear him again exercise his constitutional rights and refuse to answer questions put forth by counsel. Such an exercise in futility would do little to add to the dispute, other than needless sensationalism. Based on the facts of this case, the trial justice improperly drew a negative inference against Mrs. DiPrete.
The miscalculation of resources available to Mrs. DiPrete was compounded by the trial justice's erroneous conclusion that any value of DiPrete Realty was available to her. The evidence indicates that Mrs. DiPrete had no individual ownership or control over the business. She was in no position to liquidate any of its assets to sustain herself.
Perhaps the most disturbing aspect of the trial justice's analysis of Mrs. Di-Prete's rights under PEPRRA is his statement that, "[s]ince [Mr. DiPrete] was not eligible to receive a pension, as his spouse  innocent though she may be  she cannot collect something that he is not entitled to."[14] This assertion is just plain wrong. As discussed, Mrs. DiPrete's right to collect the pension benefits under PEPRRA does not depend on Mr. DiPrete's rights. Rather, the General Assembly expressly provided that an innocent spouse may be awarded all or a portion of pension benefits that have been reduced or revoked. Section 36-10.1-3.
As indicated by the foregoing discussion, we believe that the trial justice abused his discretion by failing to give proper regard to the economic partnership theory of marriage, misconceiving the role of needs and resources under § 36-10.1-3(d), failing to make all required factual findings and improperly drawing an adverse inference against Mrs. DiPrete. Therefore, we remand this case to the Superior Court to determine whether compelling circumstances justify the denial of Mrs. DiPrete's entitlement to the benefits earned before Mr. DiPrete's criminal activity. With respect to benefits that were earned and increased while Mr. DiPrete rendered dishonorable, indeed felonious, service, the court shall determine the extent, if any, to which justice requires such pension benefits be paid to Mrs. DiPrete. Additionally, we expect the trial justice to make full factual findings and conduct a careful analysis of the equities presented.
On remand, the Superior Court may consider all evidence of needs, resources and justice that may have developed since this case originally was heard in 1999. After conducting a proper analysis under § 36-10.1-3(d), the trial justice may determine the date such benefits shall be paid to Mrs. DiPrete since Mr. DiPrete's benefits were revoked. Any benefits the Superior Court awards to Mrs. DiPrete shall not be considered marital property subject to distribution. Moreover, the benefits shall not be subject to sale, assignment, transfer or inheritance.
This Court's decision to vacate the judgment against Mrs. DiPrete undoubtedly *296 will stoke the fires of discontent within certain spheres of the Rhode Island community. But our interpretation of PEPRRA reaches beyond the facts of this case and affects more than Mrs. DiPrete. This Court, while understanding the public's distaste for Mr. DiPrete's actions, cannot allow a continuing clamor for vengeance against Mr. DiPrete to prevent the purpose of § 36-10.1-3(d), which is to protect an innocent spouse.

IV

Return of Contribution
After revoking Mr. DiPrete's retirement benefits, the trial justice granted Mr. DiPrete's request to have his retirement contributions returned to him in their entirety. Section 36-10.1-4(a) requires the return of contributions when a public official/employee's retirement benefits have been entirely revoked. Section 36-10.1-4(a) provides:
"Any public official or public employee whose retirement or other benefits or payments are revoked pursuant to this chapter shall be entitled to a return of his or her contribution paid into the relevant pension fund(s), without interest."
Applying this language literally, the trial justice entered judgment in favor of Mr. DiPrete in the amount of $42,066.17, which represents the total amount that he contributed to the state's retirement system.
Although the General Assembly directs that the entire pension contribution be returned to the miscreant in the case of total revocation, it clearly and unambiguously called for the pro rata return of contribution in the event of a pension reduction. Section 36-10.1-4(b). Because a portion of the revoked benefits may be awarded to Mrs. DiPrete, the return of contribution provision outlined in § 36-10.1-4(a) no longer applies. Rather, the return of contributions should be made in accordance with § 36-10.1-4(b), which applies when retirement benefits have been reduced. Section 36-10.1-4(b) directs that any public official/employee whose benefits are reduced "shall be entitled to a pro rata return of a portion of his or her contribution paid into the relevant pension fund(s) in an amount proportionate to the amount of any such reduction, without interest." Clearly, a partial continuation of benefits awarded to an innocent spouse constitutes a reduction for purposes of § 36-10.1-4(b). Therefore, § 36-10.1-4(b) applies to the issue before us, and the calculation of benefits that shall be returned to Mr. DiPrete shall be made in accordance with that section.
The Retirement Board presents two arguments opposing the return of any portion of Mr. DiPrete's retirement contributions. First, apparently inspired by Mr. DiPrete's tax argument discussed above, the Retirement Board contends that any return of contributions provided for in § 36-10.1-4 is superseded by § 36-8-20 because such a return threatens the tax benefits otherwise available to Rhode Island's retirement system. This argument, however, was raised for the first time at oral argument and is consequently waived. See Bowen Court Associates v. Ernst & Young, LLP, 818 A.2d 721, 728 (R.I.2003) (holding "that a party's failure to include a particular issue in his, her, or its brief on appeal results in a waiver of that issue"). Although that argument is waived, based on our disposal of Mr. DiPrete's related tax argument, we reiterate our skepticism of any claim that any provision of PEPRRA has been superseded by § 36-8-20.
Second, the Retirement Board avers that a return of contributions is not appropriate if the public official/employee already has collected pension payments in *297 excess of his or her contributions before the benefits were revoked.[15] The General Assembly, however, failed to include such a provision in § 36-10.1-4. It is worth repeating that, "when a statute expresses a clear and unambiguous meaning, the task of interpretation is at an end and this [C]ourt will apply the plain and ordinary meaning of the words set forth in the statute." State v. Bryant, 670 A.2d 776, 779 (R.I.1996). "`If the language is clear on its face, then the plain meaning of the statute must be given effect' and this Court should not look elsewhere to discern the legislative intent." Henderson v. Henderson, 818 A.2d 669, 673 (R.I.2003) (quoting Fleet National Bank v. Clark, 714 A.2d 1172, 1177 (R.I.1998)). When "a statutory provision is unambiguous, there is no room for statutory construction and we must apply the statute as written." In re Denisewich, 643 A.2d 1194, 1197 (R.I. 1994).
Section 36-10.1-4 does not, as the Retirement Board argues, limit the amount of contributions that shall be returned depending on a particular amount that the public official/employee may have collected before the pension was disturbed. Although the General Assembly could enact such a limiting provision, it did not. "We shall not interpret a statute to include a matter omitted unless the clear purpose of the legislation would fail without the implication." State v. Feng, 421 A.2d 1258, 1264 (R.I.1980). According to the Retirement Board, the purpose behind § 36-10.1-4 was to avoid potential takings claims and to minimize the inequity of revoking an individual's pension while retaining his or her contributions. Accepting this statement as true, the purpose behind § 36-10.1-4 would not fail in the absence of an implied limitation that contributions shall not be returned if the individual has already collected in excess of his or her contributions.
The Retirement Board cites other statutory provisions to demonstrate how § 36-10.1-4 should be applied. Specifically, it cites G.L.1956 § 36-10-23(a), which provides that upon death "a benefit shall be payable consisting of the excess * * * of the total contributions of the member at the date of retirement, without interest, over the aggregate amount of all retirement allowance payments received by the member prior to his or her death." The language in § 36-10-23, however, only strengthens our conclusion. If the General Assembly intended to limit the return of contributions in the manner advocated by the Retirement Board, PEPRRA would have included language similar to the language contained in § 36-10-23. It did not.
Based on the express language of § 36-10.1-4(b), the retirement contributions paid by Mr. DiPrete shall be returned to him in an amount inversely proportionate to the amount awarded to Mrs. DiPrete.

Conclusion
For the reasons stated herein, we affirm in part and reverse in part the judgment of the Superior Court. We affirm the portion of the judgment entirely revoking Mr. Di-Prete's pension and retirement benefits. The portion of the judgment denying Mrs. DiPrete's request to continue collecting any of the revoked pension and benefits is reversed. The portion of the judgment *298 directing the return of contributions to Mr. DiPrete is vacated.
The record shall be remanded to Superior Court with instructions to consider Mrs. DiPrete's request to continue collecting the pension and retirement benefits as an innocent spouse under § 36-10.1-3(d). The Superior Court shall also recalculate the amount of retirement contributions that shall be returned to Mr. DiPrete based on the amount awarded to Mrs. DiPrete.
Justice FLANDERS and Justice GOLDBERG did not participate.
NOTES
[1] A Commitment to Honor 91 (Gordon Leidner ed., Rutledge Hill Press 2000).
[2] William Faulkner, Requiem for a Nun 92 (Random House ed. 1951).
[3] In 1991, Mr. DiPrete began receiving his pension at a rate of $42,464.28 per year. According to the retirement plan, a 3 percent cost-of-living adjustment begins in the third January after retirement. By 1999, the year the pension was revoked, pension benefits were paid at a rate of $50,777.
[4] As the executive director of the Employees Retirement System of Rhode Island (director) described, health coverage and life insurance is provided pursuant to G.L.1956 § 36-12-4 and § 36-12-6, not by G.L. 1956 Chapters 8 and 10 of title 36. The director explained that "[t]he retirement system * * * function[s] as a conduit by which its retirees reimburse the State for their portion of the cost of those State benefits." At the time of his retirement, Mr. DiPrete elected to continue his health coverage and life insurance.
[5] Although Mrs. DiPrete did not receive permission to intervene in the action and no order specifically consolidated the two cases, the Superior Court treated the two cases as though they were one case and so do we.
[6] Ambrosius Theodosius Macrobius, in A Book of Latin Quotations 385 (Norbert Guterman compiler 1966).
[7] In its original form, the Retirement Board was directed to Ii]nitiate a civil action in the superior court for the revocation or reduction of any retirement or other benefit whenever a public official/employee was convicted or pled to the charge. P.L.1996, ch. 292, § 2 (G.L.1956 § 36-10.1-3(B)(1)). The Retirement Board's obligation to initiate such proceedings did not depend on an absence of a finding in a criminal action.
[8] By using the term "estop," the General assembly was not necessarily referring to collateral estoppel. "In using the term `estoppel,' one is of course aware of its kaleidoscopic varieties." John H. Wigmore, The Scientific Role of Consideration in Contract, in Legal Essays in Tribute to Orrin Kip McMurray 641, 643 (1935). Indeed, Blacks Law Dictionary identifies twenty-four variations of estoppel doctrines. Black's Law Dictionary 570-72 (7th ed. 1999).
[9] We do note, however, that Mr. DiPrete fails to refer to any action taken by the Internal Revenue Service (IRS) that would indicate the IRS's concerns over PEPRRA.
[10] We take solace in Abraham Lincoln's observation: "While the people retain their virtue and vigilance, no administration by any extreme of wickedness or folly can very seriously injure the government in the short space of [six] years." A Commitment to Honor, at 48. Battered the state may be, but the brilliance of democracy is to survive such periods as this.
[11] Mr. DiPrete challenges this aspect of the trial justice's ruling in the portion of his brief devoted to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure issue. As discussed, however, our review of a motion to dismiss filed pursuant to Rule 12(b)(6) is limited to the allegations contained in the pleadings. Accordingly, the proper application of PEPRRA would have no bearing on our review of the trial justice's ruling on that motion. Rather, the question of whether the trial justice made a proper analysis under PEPRRA could have an effect on his finding that Mr. DiPrete was not entitled to continue collecting his pension.
[12] "[A] son will not bear responsibility for his father's guilt, nor a father for his son's." Ezekiel 18:20.
[13] The Retirement Board did not question the propriety of Mr. DiPrete's Fifth Amendment assertion. Indeed, the Retirement Board declined the trial justice's offer to consider holding Mr. DiPrete in contempt of court for refusing to testify.
[14] Although this statement appears in the trial justice's decision denying Mrs. DiPrete's motion for new trial rather than in the actual decision denying her request for benefits, the statement does indicate a flawed analysis on the part of the trial justice in denying Mrs. DiPrete's request.
[15] The Retirement Board's argument with respect to this issue is centered on § 36-10.1-4(a), which provides for a total return of contributions if retirement benefits are entirely revoked. That argument, if convincing, logically would extend to a partial return of contributions ordered under § 36-10.1-4(b). Therefore, we will address the merits of this argument in the context of § 36-10.1-4(b).